J-A05007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: H.C., A MINOR | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| APPEAL OF: H.H., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 1243 MDA 2021 |

Appeal from the Order Entered August 31, 2021
In the Court of Common Pleas of Susquehanna County Orphans' Court at
No(s):  Adopt-019-2019

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:          **FILED: JUNE 17, 2022**

Appellant, H.H., ("Mother") appeals from the August 31, 2021 order terminating her parental rights pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, to her dependent child, H.C., who was born in December 2010.  We affirm.

This Court previously summarized the procedural history as follows:

On August 21, 2019, Susquehanna County Services for Children and Youth ("SCSCY") filed a petition for involuntary termination of Mother's parental rights to H.C. ("termination petition") pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), and (b).[FN2]  On September 28, 2020, Mother executed a consent to adoption in which she agreed to the voluntary termination of her parental rights to, and adoption of, H.C.  SCSCY petitioned the trial court to confirm Mother's consent to voluntary termination of her parental rights and adoption on November 5, 2020.  On January 15, 2021, the trial court found that Mother wished to revoke her consent to voluntary termination of parental rights and adoption,

_____

[*] Former Justice specially assigned to the Superior Court.

and the trial court entered an order granting Mother's motion to revoke her consent and ordered that the matter proceed with an involuntary termination hearing.

> [Footnote 2] A review of the certified record reveals that the parental rights of J.C., the child's biological father, ("Father") were involuntarily terminated by trial court order dated September 30, 2020, and entered October 5, 2020. Father did not appeal the order terminating his parental rights and he is not a party to this appeal.

> The trial court conducted an involuntary termination hearing virtually *via* advanced communication technology due to the COVID-19 global pandemic on March 1, 2021, March 23, 2021, June 30, 2021, and August 13, 2021, and conducted a person-to-person in-camera review of the child on July 1, 2021, at which only the child and guardian *ad litem* were present by stipulation of the parties. On August 23, 2021, the trial court entered an order terminating Mother's parental rights to H.C. On August 31, 2021, the trial court entered an amended order terminating Mother's parental rights to H.C. that included a correction as to Father's last name.

*In re H.C.*, 2022 WL 816984, at *1 (Pa. Super. Mar. 18, 2022) (unpublished memorandum) (footnote 2 in original; record citations and footnote 3 omitted). On appeal, this Court was unable to conduct a meaningful appellate review of the August 31, 2021 amended order terminating Mother's parental rights to H.C. because the trial court's order lacked an analysis with reference to the certified record. *Id.* at *7. We remanded the matter to the trial court in order that the trial court could file a comprehensive Rule 1925(a) opinion analyzing the applicable law and the facts of the case. *Id.* The trial court filed a supplemental Rule 1925(a) opinion on April 7, 2022. Mother filed a response to the trial court's supplemental opinion with this Court on April 21, 2022, and SCSCY filed its response with this Court on May 6, 2022. Having

- 2 -

received the trial court's supplemental Rule 1925(a) opinion and the parties'
responses, we address the merits of Mother's appeal.

Mother raises the following issues for our review:

[1.] Did the trial court err [or] abuse its discretion in terminating
the parental rights of [Mother], where [SCSCY] failed to
present sufficient evidence to satisfy the elements of 23
Pa.C.S.A. § 2511(a)(2) or [another] section not specifically
mentioned in the trial court's [August 31, 2021] amended
order?

[2.] Did the trial court err or abuse its discretion in terminat[ing]
the parental rights of [Mother], where [SCSCY] failed to
present sufficient evidence to establish that termination was
in the best interest of H.C., [pursuant to 23 Pa.C.S.A.
§ 2511(b)]?

[3.] Whether the trial court erred as a matter of law [or]
manifestly abused its discretion by not sufficiently stating
with specificity [and] reference to the record its basis for
terminating [Mother's] parental rights [pursuant to 23
Pa.C.S.A. § 2511(a)(2) and (b)]?

[4.] Whether the trial court erred as a matter of law [or]
manifestly abused its discretion in determining whether
[SCSCY] presented sufficient evidence to satisfy the
grounds for termination of [Mother's] parental rights under
23 Pa.C.S.A. § 2511(a)(2) or [another] section not
specifically mentioned in the trial court's [August 31, 2021]
amended order?

[5.] Even if [this Court] determines [SCSCY] presented sufficient
evidence to satisfy the grounds for termination of [Mother's]
parental rights under 23 Pa.C.S.A. § 2511(a)(2) of the
Adoption Act or [another] section not specifically mentioned
in the trial court's [August 31, 2021 amended] order,
[whether] the trial court nevertheless erred as a matter of
law [or] manifestly abused its discretion in determining
termination of [Mother's] parental rights [was] in the best
interests of [H.C., pursuant to 23 Pa.C.S.A. § 2511(b)]?

- 3 -

Mother's Brief at 7-8 (extraneous capitalization omitted).[1]

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

---

[1] The fourth and fifth issues raised by Mother on appeal are duplicative of the first and second issues raised by Mother, respectively.

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*B.J.Z.*, 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re I.J.*, 972 A.2d 5, 9 (Pa. Super. 2009).

Sections 2511(a) provides, in pertinent part, as follows:

**§ 2511.  Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (2) and (5).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect[,] or refusal; (2) such incapacity, abuse, neglect[,] or refusal has caused the child to be without essential parental care, control or subsistence necessary for his[, or her,] physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied.

- 6 -

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal[,] as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015).

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*Z.P.*, 994 A.2d at 1117 (citation omitted).

A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself[, or herself,] to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation, original quotation marks, and original paragraph formatting omitted), *appeal denied*, 872 A.2d 1200 (Pa. 2005).

"[W]hen a parent has demonstrated a continued inability to conduct his [or her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." *Z.P.*, 994 A.2d at 1118 (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* (citation and original quotation marks omitted).

Section 2511, in "permitting the termination of parental rights[,] outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his [or her] parental rights terminated." *Id.* (citation and original quotation marks omitted).

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his [or her] ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs.

*Id.* at 1119 (citation and original brackets omitted).

> Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at

least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re C.B.*, 230 A.3d 341, 348 (Pa. Super. 2020), *appeal denied*, 234 A.3d 410 (Pa. 2020).  In considering whether the conditions which led to removal and placement of the child continue to exist, courts should consider whether the parent cannot or will not remedy the conditions within a reasonable period of time and whether the services reasonably available to the parent are unlikely to remedy the conditions within a reasonable period of time.  *M.E.P.*, 825 A.2d at 1273.  In contrast to termination under Section 2511(a)(2), which addresses situations where remedial aid by an agency is not required, termination under Section 2511(a)(5) elevates consideration of the services provided to the parent by an agency and the likelihood that such services will remedy the conditions which let to the child's removal.  *In re A.S.*, 11 A.3d 473, 481-482 (Pa. Super. 2010).

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child.  Section 2511(b) states,

### § 2511.  Grounds for involuntary termination

. . .

**(b)** **Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated

solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(b).  The analysis under Section 2511(b)

focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.  As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act.  Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis.  While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of J.N.M.*, 177 A.3d 937, 943-944 (Pa. Super. 2018) (citation and original brackets omitted), *appeal denied*, 183 A.3d 979 (Pa. 2018).  A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond.  *J.N.M.*, 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); *see also In re*

*C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)).

It is well-established that this Court need only agree with the trial court as to any one section of Section 2511(a), as well as Section 2511(b), in order to affirm an order involuntarily terminating parental rights. *C.D.R.*, 111 A.3d at 1215, *relying on* *In re B.L.W.*, 843 A.2d 380 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

In terminating Mother's parental rights to H.C., the trial court set forth the following 18 findings of fact in its August 31, 2021 amended order:

### FINDINGS OF FACT

1. The subject child is [H.C.], [who was born in] December [] 2010.

2. The petitioner is [SCSCY] with an address of 75 Public Avenue, Montrose, Susquehanna County, Pennsylvania, 18801.

3. [Mother was born in] July [] 1991[,] and [resided in] Lackawanna County, Pennsylvania[.]

4. [Father was born in] May [] 1986, and [his] address is unknown.

5. [] Father's parental rights [to H.C.] were terminated [by trial court order dated] September 30, 2020[, and entered October 5, 2020].

6. The minor child was found dependent [by the trial] court on August 11, 2016.

7. The minor [child] has been in placement since [August 2016,] and [] expressed that she would like to be adopted by her pre-adoptive foster parents.[2]

8. The minor has had six [] previous placements.

9. [] Mother has not shown significant progress towards alleviating the circumstances that necessitated placement.

10. [] Mother has not shown that she is able to maintain stable, consistent housing.

11. [] Mother has not maintained any ongoing [or] significant contact with the child since placement.

12. [] Mother has relocated to Missouri.

13. Pursuant to 23 Pa.C.S.A. § 2511(a)(2), grounds exist for involuntary termination of [] Mother's rights in that the repeated and continuous inability, neglect[,] and refusal of [] Mother to perform her parental duties [] caused the child to be without essential parental care, control[,] or subsistence necessary for her physical and mental

_____

[2] As discussed more fully *infra*, H.C. wrote a letter to the trial court expressing, *inter alia*, that she wished to be adopted by her foster family because "they loved [her] and [she] loved them." In that letter, H.C. indicated that, at the time she wrote the letter, she was 9 years old and would be starting fourth grade "next year." These statements support the inference that the letter, while undated, was written sometime after her 9th birthday, which occurred in December 2019, and before the start of fourth grade in September 2020, which is well before the termination hearing began in March 2021. Therefore, H.C.'s preference was to be adopted.

Since no conflict existed between H.C.'s legal interests, which were synonymous with her expressed preference to be adopted, and H.C.'s best interests, which were to involuntarily terminate Mother's parental rights and to permit adoption, the appointment of the guardian *ad litem* as counsel representing both the child's legal interests and her best interests was sufficient. **See In re P.G.F.**, 247 A.3d 955, 964 (Pa. 2021) (stating that, when a child's best interests and legal interests do not conflict, the trial court may appoint a single attorney to serve in the dual capacity of guardian *ad litem* and legal counsel).

well-being, and the conditions and causes of the neglect and refusal cannot and will not be remedied by [] Mother.

14. The minor child has been removed from the care of [Mother] by the [trial] court or under a voluntary agreement with [SCSCY] for a period of at-least six [] months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonabl[e] period of time[,] and termination of the parental rights would best serve the needs and welfare of the minor child.

15. [] Mother has not [] perform[ed] any parental duties for the minor child for a period in excess of six [] months.

16. [SCSCY] desires to terminate the parental rights of [] Mother so that the minor child can be adopted by suitable persons, previously identified in the dependency matter.

17. [SCSCY] is willing and able to take continued custody of the minor child until adoption can be finalized.

18. To the best of [SCSCY's] knowledge, [Mother] is not entitled to the benefits of the Soldiers' and Sailors' Civil Relief Act of 1940, as amended 50 U.S.C.A. § 501, *et seq*.

Trial Court Amended Order, 8/31/21, at 1-3 (extraneous capitalization omitted).  The trial court supplemented its findings of fact as follows:

Mother relocated to Missouri in [] December [] 2020[,] and has made little to no effort to communicate with [H.C.] since that time. [A SCSCY] caseworker [] has been involved with this matter since September [] 2018, when the matter was transferred to Susquehanna County, but [H.C.] has been in placement since August [] 2016.  [The SCSCY caseworker] noted minimal compliance and progress by Mother throughout the entirety of this matter.  Because of Mother's minimal compliance, the supervised visitation schedule never changed throughout the years.  [The caseworker] testified that when Mother resided locally, drug paraphernalia was found within the home.  Dog urine and feces were present.  There were accusations of domestic violence.

- 13 -

Mother was discharged from different medical providers for noncompliance. Mother relied on others to assist in paying bills. Mother relies on both marijuana and Xanax on a regular basis.

Since [H.C.] has been in placement, Mother [] moved four [] times into four [] different school districts. Mother moved to Missouri in December [] 2020[,] and still resides there today. Mother [] frequently had individuals with substance abuse problems living in her home. Mother participated in therapy where she worked on things such as patience, age-appropriate reactions, control, disciplinary methods[,] and communication. Mother has been discharged from numerous therapists for noncompliance. Mother's last visit with [H.C.] was on December 9, 2020. Mother never requested [tele]phone contact with [H.C.,] and [H.C.] did not wish to speak to Mother because [H.C.] was angry with her Mother for relocating to Missouri.

Despite wanting to reunite with [H.C.], it is not Mother's intention to relocate back to Pennsylvania. Mother has several children but has physical custody of none of them. Mother has not been to [a] counseling [session] since moving to Missouri in December [] 2020. Mother is currently on Xanax, Hydroxyzine, Amitriptyline[,] and medical marijuana[.]

When Mother told [H.C.] she was moving to Missouri during their last visit on December 9, 2020, the meeting did not end well. Sometime thereafter, [H.C.] mailed a handwritten letter to Mother inquiring whether Mother still loved her and asking Mother to respond by circling ["yes" or "no."] Rather than responding [directly to H.C., Mother sent a text message *via* her cellular telephone to a SCSCY caseworker instructing the caseworker] to tell [H.C.] she circled ["yes."] Mother [further instructed the caseworker to tell H.C. that] "she should put her big girl pants on and call [Mother."] At the time, [the SCSCY caseworker] did not know about the letter. Once [the caseworker] became aware of the situation, [she] arranged a video conference [call,] in [] April [2021,] with Mother, [H.C.'s foster mother,] and [the caseworker] to discuss [Mother] writing a letter back to [H.C.] Mother wrote a letter to [H.C.] sometime in May [2021,] and[,] following the receipt of [the letter, H.C.] indicated to [the caseworker that] she did not want to have [future] contact with Mother. As of the June 30, 2021 [termination] hearing, the last contact [the caseworker] had with Mother was on April 5, 2021[, for purpose of] the [video] conference [call] regarding the letter. Mother has not reached out regarding [H.C.] since that time.[FN2] Mother never consistently

- 14 -

reached out to [the caseworker] as it pertained to [H.C.] during [the caseworker's] involvement in this matter.

> [Footnote 2:] Mother came to Pennsylvania in [] July []2021[,] for another proceeding and never attempted to contact [SCSCY] or [H.C. H.C.] saw Mother on the news and inquired to her foster parents why her Mother did not attempt to contact her.

During the [termination] hearing [a clinical psychologist] testified as an expert in clinical psychology, which encompasses the diagnosis of severe pathology and trauma-related disorders. [The clinical psychologist] met with Mother on two [] occasions and[,] as a result, [] authored two [] evaluation reports dated October 22, 2018[,] and June 29, 2020. Following the October 22, 2018 evaluation, [the clinical psychologist] noted that Mother presented with characteristics of cluster B personality disorders and post-traumatic stress disorder [("PTSD")]. Personality disorder characteristics include the inability to consider the welfare of other individuals. During the evaluation that resulted in the June 29, 2020 report, [the clinical psychologist] noted that the personality traits were still significant and that during the interview, Mother was manipulative and resistant. Based upon [Mother's] evaluation, [the clinical psychologist] had concerns regarding Mother's ability to appropriately parent, to exercise good parental judgment[,] and her accountability. Mother reported [] that she did not have any feelings toward [H.C.]

[An] expert in social work and parent-child relationships [["relationships expert")]] worked with Mother from March 13, 2020[,] until November 18, 2020[,] to observe Mother with [H.C.] approximately two [] times per week and to assist in relationship development. When asked to describe her observations with Mother and [H.C., the relationships expert] stated that Mother displayed inabilities to set boundaries with [H.C.] and their relationship was one of friendship rather than mother and child. During a [] meeting with Mother, [which was conducted *via* advanced communication technology, the relationships expert] reported that Mother was grinding marijuana and Mother defended her actions by stating she had a medical marijuana card. Mother is on medical marijuana for long term effects of staying on Xanax. [The relationships expert] further testified that Mother has difficulty with her coping skills, has anger issues, [demonstrates] an inability to set rules and boundaries[,] and [has] an inability to use age-appropriate language.

[H.C.] was a different child when meeting individually with [the relationships expert] than when Mother was present. [H.C.] views herself as the caretaker of her Mother. [H.C.] had a fear of Mother's rejection, anger[,] and how her Mother would respond if she was open and honest. Mother has [spoken negatively about H.C.'s] foster mother in front of [H.C.]

[H.C.] has been in foster care for approximately [63] months, almost half of her life. [H.C.] resides in a stable home. She has friends. She desires to stay with her foster parents, whom she calls mom and dad, and with whom she is bonded. [H.C.'s] foster parents wish to adopt her[,] and [H.C.] wants to be adopted by her foster [parents]. [H.C.] has been in the same placement for approximately five [] years.

Trial Court Supplemental Opinion, 4/7/22, at 3-7 (record citations omitted).

In her first and fourth issues, Mother challenges the trial court's determinations under Section 2511(a)(2), arguing that the trial court failed to consider evidence of a "long-term pattern of sexual harassment and sexual assault of Mother in person and *via* social media" by Mother's former attorney, who was appointed by the trial court to represent Mother in this matter. Mother's Brief at 20. Mother asserts that the trial court erred in finding sufficient grounds for termination under Section 2511(a)(2) despite Mother's credible evidence of "receiving intensive mental health treatment after being victimized by [her former attorney], visiting [H.C.] over a hundred times, taking actions to be reunited with [H.C.] by complying with the family service plan[,] and attempting to maintain a meaningful relationship with [H.C.]" ***Id.*** at 21 (extraneous capitalization omitted).

SCSCY asserts, and the guardian *ad litem* agrees, that, during H.C.'s placement, "Mother has never been fully involved or demonstrated an ability

to appropriately parent [H.C.]" SCSCY's Brief at 19-20; *see also* Guardian *Ad Litem*'s Brief at 2-3.

In terminating Mother's parental rights under, *inter alia*, Section 2511(a)(2), the trial court found that Mother failed to meet her parental duties towards, and the needs of, H.C. Trial Court Supplemental Opinion, 4/7/22, at 7. The trial court stated that, since moving to Missouri in December 2020, Mother has made no effort to provide for H.C. and has had no communication with H.C. *Id.* The trial court noted, *inter alia*, that Mother failed to conduct her life in a fashion that provided a safe environment for H.C., was discharged from the care of numerous medical providers and therapists for noncompliance, indicated that she did not intend to relocate back to Pennsylvania, maintained a relationship with H.C. that was one of friendship rather than mother-child, and reported that she did not have feelings toward H.C. *Id.* at 3-6. The trial court found that despite having over five years to remedy the situation that caused H.C.'s placement, and to repair her relationship with H.C., Mother "failed to put forth anything more than minimal efforts" and continued to exhibit instability and inconsistency with regard to H.C. *Id.* at 7.

A clinical psychologist who evaluated Mother in October 2018, reported concerns about Mother's ability to exercise good parental judgment and

appropriately parent H.C.[3]  N.T., 3/1/21, at 29.  These concerns remained

unchanged after further observations by the clinical psychologist in June 2020.

*Id.*  In the October 22, 2018 psychological evaluation report, the clinical

psychologist authored the following diagnostic impression of Mother:

> Based on the present evaluation of [Mother], there were significant concerns identified with respect to her ability to provide for the welfare of [H.C.  These] concerns include psychological dysfunction[,] as well as impaired social and personal judgment. [Mother] appears to exhibit symptoms considered under the Cluster B category of personality disorders to include antisocial personality disorder [and] borderline personality disorder, as well as symptoms associated with anxiety related disorders to include [PTSD.  Mother] presented with a pattern of unstable and intense interpersonal relationships which seem to mirror a theme of alternating between extremes of idealization and devaluation.  Her relationship with her mother[,] as well as intimate partners[,] exhibits this pattern.  She presents with instability of affect in terms of intense periods of anxiety, depression, anger [or] hostility, and social withdraw.  [Mother] exhibits what appears to be stress[-]related paranoid ideation.  She seems to lack emotional investment in relationships and lacks personal [and] social judgment.  [Mother] is remarkably intelligent which contributes to her ability to manipulate others in a manner that she has a tendency to play the victim for personal gain.  This is not an uncommon characteristic of individuals with personality disorders. While [Mother] clearly [] experienced adversities in her life such as dealing with her mother's mental health issues and becoming a mother herself at a young age, she presents with clear concerns at this present time.  It is not denied that [Mother] has had traumatic experiences in her life[,] however[,] the details and circumstances are suspect.  Her relationship[] with [H.C.] appear[s] to be somewhat superficial in that she lacked emotional reaction as she described separation from [H.C.]  She was much more focused on the perceived violations of [SCSCY] against her [than] on the loss [and] separation from [H.C.  Mother] displays

_____

[3] The trial court admitted the clinical psychologist as an expert in the field of clinical psychology.  N.T., 3/1/21, at 21.

gross impairment in the areas of personal and social judgment. She lacks an understanding of the potential deleterious effects that her decisions have made on [H.C.'s] emotional and physical needs.

N.T., 3/1/21, at Exhibit 2 (extraneous capitalization omitted).[4] In finding at the conclusion of the June 2020 evaluation that significant concerns continued to exist regarding Mother's "ability to provide for the welfare of [H.C.] particularly in light of the lack of observable and measurable change in treatment and according to SCSCY[,]" the clinical psychologist stated,

[Mother] has been reportedly in therapy[,] however[,] it is difficult to determine what she [] addressed in therapy as there is no report on the specific goals she was working on and how her progress was measured or determined. To [Mother's] great credit, she was able to identify what triggers her anger[,] and she is able to report several strategies to deal with her emotions. This

---

[4] We note that certain SCSCY exhibits admitted at the termination hearing are not part of the certified record but do appear in the supplemental reproduced record filed by SCSCY with this Court on December 29, 2021. Generally, we may not consider documents contained in the reproduced record. One exception permits our consideration of such documents when the documents have been submitted to the trial court and the accuracy of the reproduction has not been disputed by the parties. *El-Gharbaoui v. Ajayi*, 260 A.3d 944, 965 (Pa. Super. 2021) (stating, "[g]enerally, we may not consider documents contained in the reproduced record if they were never filed with the trial court" or if the accuracy of the documents is disputed); *see also Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012) (stating, documents contained in the reproduced record may be considered if they have been submitted to the trial court and the accuracy of the reproduction is not disputed).

Here certain exhibits were admitted as evidence during the termination hearing (*see* N.T., 3/23/21, at 85) and neither Mother nor the guardian *ad litem* have objected to the accuracy of the reproduction of the exhibits contained in SCSCY's supplemental filing. Therefore, we will consider the exhibits and will reference them by exhibit numbers as gleaned from a review of the termination hearing transcript.

is good progress[,] however[,] she continues to report problems with anger reactivity. She harbors a great deal of hostility toward her caseworker which she seems to focus on more [so] than [] what she needs to do to comply and spend quality time with [H.C.] and foster a connection in the hopes of reunification.

[Mother] historically attempted to manipulate the evaluation process. During the last interview[,] she claimed she could not [read] the assessment to complete it[,] so a friend had to come and bring her glasses. The first attempt to reevaluate her presented with scheduling difficulties on [Mother's part] and then when it was scheduled, she did not attend and said she lost power in her home. On the date of the current evaluation[,] she stated that she had [methicillin-resistant staphylococcus aureus] with a fever and demanded that [H.C.] come into the evaluation. This is a clear example of the manipulative behavior pattern [in which] she tends to engage. In the moment[,] it is believed that [Mother] thinks that these are valid issues[,] however[,] after she is confronted[,] she seems to ultimately comply and participate.

The results of the [evaluation tests] were overall consistent with the last evaluation. Some differences were her level of depression reported [] was lower but her anxiety and somatoform symptoms were higher. [The evaluation results] indicated that she may have attempted to be deceptive or tried to present herself in a more positive light. This may have been due to the length of time it took her to complete the test or possibly her anxiety. All in all[,] however[,] the results were consistent in terms of supporting a Cluster B personality disorder. She presents with an overall pattern of manipulative tendencies, interpersonal hostility, difficulty managing her reactivity, [and] a tendency to avoid emotionally intimate relationships. Further [Mother] seems to manifest most of her anxiety and stress physically. She endorsed a significant number of symptoms related to somatoform disorder in both assessments[,] as well as in her self[-]report during the interview.

[Mother] continues to endorse items related to PTSD and trauma therapy continues to be recommended in addition to anger management.

*Id.* at Exhibit 3.

A relationships expert testified that she observed the interaction between Mother and H.C. during the period of March 2020, through November 2020.[5] *Id.* at 82. The relationships expert described the bond between Mother and H.C. as one of friendship, rather than mother-child. *Id.* at 84. The relationships expert stated, *inter alia*, that Mother possessed an inability to set boundaries with H.C., that she lacked any form of coping skills necessary to deal with her emotions and difficult situations, she got angry very easily, and she did not know how to control that anger. *Id.* at 85. The relationships expert expressed that Mother's ability to parent full-time was "non-existent" and this inability to parent full-time remained constant throughout the period of observation with no change despite the counseling and resources Mother received. *Id.* at 91-92, 114.

A SCSCY caseworker testified that H.C.'s placement was initially due to Mother's incarceration and H.C.'s grandmother's inability to care for the child. *Id.* at 124. Once Mother was released from incarceration, placement continued, the caseworker explained, because Mother did not have adequate housing. *Id.* at 125. Mother had been directed to maintain stable housing, obtain mental health treatment, attain financial stability for herself and H.C., avoid situations that may lead to domestic violence, remain drug-free, and maintain a drug-free living environment. *Id.* At the initial permanency review

_____

[5] The trial court admitted the relationships expert as an expert in social work and parent-child interaction. N.T., 3/1/21, at 81.

- 21 -

hearing, Mother received a "minimal compliance, minimum progress" assessment in terms of meeting her assigned goals, which resulted in limited, supervised visitation with H.C. *Id.* at 119-120. The caseworker explained that because Mother continued to demonstrate "minimum compliance" and "minimum progress" at subsequent permanency hearings, Mother's visitation with H.C. remained supervised and limited in duration. N.T., 6/30/21, at 98-99. The caseworker testified that SCSCY has "not seen significant progress or compliance from [Mother] that she can provide day in day out care for [H.C.]" N.T., 3/23/21, at 15. The caseworker explained that Mother's housing situation, financial solvency, and mental health issues continue to remain a concern. *Id.* at 16-20.

A mental health expert, who began seeing Mother as a mental health patient in April 2019, and who continued Mother's treatment through the time of the termination hearing, testified on Mother's behalf. *Id.* at 93. This mental health expert interacted with Mother *via* virtual tele-medicine sessions once Mother relocated to Missouri in December 2020.[6] *Id.* at 93. The mental health expert stated that, while living in Missouri, Mother made significant progress with her life, having, *inter alia*, lost weight, obtained employment, and established living arrangements with her paramour, whom she lived with while residing in Pennsylvania. *Id*. 119-121. The mental health expert opined that

___

[6] The trial court admitted the mental health expert as an expert in mental health trauma therapy with an emphasis on clinical psychology. N.T., 3/23/21, at 92-93.

Mother was "one hundred percent capable and willing to raise [H.C.] appropriately." *Id.* at 126. On cross-examination, however, the mental health expert acknowledged that her assessment of Mother's "significant improvements" was based upon Mother's self-reporting to the expert during their virtual treatment sessions, as the mental health expert was located in Pennsylvania and Mother resided in Missouri. *Id.* at 130-131. The mental health expert stated that she accepted the findings of the clinical psychologist who evaluated Mother in October 2018, and again in June 2020, including the finding that Mother "tends to manipulate the [mental health evaluation and] testing process[.]" *Id.* at 133. The mental health expert admitted she never observed Mother interact with H.C. so her assessment that Mother's parenting skills improved was based solely on Mother's self-reporting. *Id.* at 134-135.

Mother testified that, in Missouri, she maintains a house with her paramour and has her own means of transportation. N.T., 6/30/21, at 29-30. Mother acknowledged that, in Missouri, she obtained a job for about two months on a probationary basis but that she was no longer employed due to the time she was absent from her job to resolve her legal issues. *Id.* at 11. Mother testified that, while still living in Pennsylvania, she stopped attending H.C.'s parent-teacher conferences and academic and extracurricular activities at H.C.'s school because H.C.'s foster mother "did not feel comfortable with" Mother attending. *Id.* at 44-45. Mother disagreed with the relationships expert's assessment that Mother lacked any form of coping skills, stating, instead, that she learned "dozens of different coping skills" that she uses

"almost every hour" in her day-to-day life. *Id.* at 48-51. Mother further stated that the clinical psychologist, who evaluated her in 2018, and 2020, received information regarding Mother prior to the evaluations and that the clinical psychologist had "already made her decisions about [Mother] – her opinions about [Mother]" prior to meeting with Mother and conducting the evaluations. *Id.* at 55. When asked if Mother would relocate to Pennsylvania in order to reunite with H.C., Mother testified that it was not her intention to relocate to Pennsylvania but that she would "do anything and everything I can to be reunited with [H.C.]" *Id.* at 58, 82, 87.

Mother acknowledged that, as of the June 30, 2021 termination hearing, Mother's last visit with H.C. occurred on December 9, 2020. *Id.* at 58. Some time after Mother moved to Missouri, H.C. wrote a letter to Mother asking if Mother still loved her and asked Mother to circle "yes" or "no" in her reply to H.C. *Id.* at 60, 88; *see also* N.T, 3/23/21, at 25. Mother did not reply directly to H.C. because, as Mother explained, "pretty much everything I've done so far has been twisted[.]" N.T., 6/30/21, at 64. Instead, Mother sent a cellular text message to the SCSCY caseworker, which stated as follows:

> I want to talk to my daughter and I'm getting irritated with the situation. Tell [H.C.] that I said "I circled YES and there[ are] other important things I need to discuss with her so she should put her big girl pants on and call me.["]
>
> Also[, I am] rather sick of hearing your response [(referring to the caseworker)]. I want HERS in her real words this time. I'm not fond of her high[-]pitched squeaky words. Thanks.

*Id.*; *see also* N.T., 3/23/21, at Exhibit 5 (Text Message Screenshots).

Based upon our review of the record, we discern no abuse of discretion by the trial court in finding sufficient grounds to terminate Mother's parental rights to H.C. under Section 2511(a)(2). The record supports the trial court's findings that Mother failed to perform her parental duties and failed to meet the needs of H.C. and that during the more than five years H.C. has been in placement, Mother put forth only minimal efforts to remedy the circumstances. The clinical psychologist, relationships expert, and SCSCY caseworker all testified that, during the period in which they evaluated, observed, or interacted with Mother, Mother failed to demonstrate significant improvement in addressing her housing and financial needs, as well as addressing her mental health needs, including, *inter alia*, developing coping skills for confronting life's challenges in order to provide a stable and consistent environment for H.C. While Mother testified that she developed coping skills and would do anything necessary to reunite with H.C., the trial court found, and the record supports, that when H.C. asked Mother to state whether Mother still loved her, yes or no, Mother chose to send a message to a SCSCY caseworker and then asked the caseworker to inform H.C. to "put her big girl pants on" and call Mother. Contrary to her affirmative parental obligation, Mother did not contact H.C. directly. ***See S.P.***, 47 A.3d at 828 (noting a parent's affirmative duty to "love, protect[,] and support [the] child and to make an effort to maintain communication and association with that child"). Therefore, we find no abuse of discretion or error of law on the part

of the trial court in concluding that sufficient grounds existed to terminate Mother's parental rights to H.C. under Section 2511(a)(2)

In her second and fifth issues, Mother challenges the trial court's finding that termination of Mother's parental rights was in the best interest of H.C. under Section 2511(b). Mother's Brief at 21-24. Mother asserts that there is a "strong bond and attachment between Mother and" H.C., citing as an example a card H.C. sent to Mother "where [H.C.] stated she loved Mother [and] asked if Mother still loved [H.C.] even though they had not visited in person since December 2020." *Id.* at 23. Mother contends that maintaining H.C.'s contact with Mother "best serves [H.C.'s] needs and welfare[.]" *Id.* at 23-24.

The trial court found that Mother's relationship with H.C. was "one of friendship rather than mother and child." Trial Court Supplemental Opinion, 4/7/22, at 6. The trial court further found that H.C. "views herself as the caretaker of her Mother" and has "a fear of Mother's rejection, anger[,] and how [] Mother would respond if [H.C.] was open and honest" with Mother. *Id.* In finding that termination of Mother's parental rights, and, thereby, permitting H.C. to be adopted by her foster parents, was in the best interest of H.C., the trial court noted that H.C. "resides in a stable home[,] has friends[,] and desires to stay with her foster parents, whom she calls mom and dad, and with whom she is bonded." *Id.* at 7.

The relationships expert testified that, during her observations of Mother and H.C. together versus H.C. alone, she noted that H.C. "was a different

person" when she was not with Mother. N.T., 3/1/21, at 86. Upon inquiry, H.C. explained to the relationships expert that

> she felt she had to act a certain way around [Mother]. She felt that she could not be herself because [Mother] wouldn't accept her and that she was unable to speak with [Mother] about anything that bothered her about the relationship out of fear of [Mother's] anger or rejection.

*Id.* at 87. The relationships expert stated that H.C. felt she was responsible for Mother, that she was the caretaker of Mother, worrying about where Mother was living, how Mother's relationship with her paramour was going, and whether Mother was financially stable.[7] *Id.* H.C. described her life with her current foster family as a "stable home," referred to her foster parents as mom and dad, and indicated that she wanted to remain with her foster family. *Id.* at 88.

The SCSCY caseworker stated that, despite her efforts to initiate communication between Mother and H.C., H.C. has not wanted to

---

[7] H.C. wrote a letter to the trial court that stated as follows:

> My name is [H.C.] and I am 9 years old. I will be going into [fourth] grade next year. I have lived with [my foster family] since I was [five]. I like living with them too. They are my family. I like my school and friends. I love my mom [(referring to Mother)] too. I'm not sure [Mother] can take care of me. I don't want to go through this again. When I see [Mother,] I just know something is wrong but she won't tell me. I worry about [Mother's] boyfriends and I don't trust them. She moves on from them for a reason. I want [my foster family] to adopt me because they love me and I love them.

N.T., 3/23/21, at Exhibit 6.

communicate with Mother, either virtually over the internet or *via* telephone, since Mother relocated to Missouri. N.T., 3/23/21, at 26. In an in-camera interview of H.C. conducted by the trial court, with only the guardian *ad litem* present, H.C. stated that she thought it was better for both parties that Mother moved to Missouri and that she did not want to see or talk to Mother. N.T., 7/1/21, at 20-21. H.C. explained that if she returned to living with Mother, she was more likely to be in danger because, *inter alia*, Mother had a firearm, and that she would not be in danger if she continued to live with her foster family. *Id.* at 25, 27.

Based upon our review of the record, we find clear and convincing evidence to support the trial court's conclusion that termination of Mother's parental rights to H.C. serves the best interest of the child. The evidence supports that, while a limited bond may exist between Mother and H.C., that bond is one of friendship in which H.C. assumes the role of "the parent" expressing worry and concern over Mother's well-being and stability. Conversely, Mother, when given the opportunity to communicate directly with H.C., chose instead to communicate *via* text messaging with the SCSCY caseworker, telling the caseworker to convey a message to H.C. to put on her "big girl pants" and call Mother. H.C. has a strong bond with her foster parents, having spent more than half of her life in their care, and her foster parents are in the best position to provide a stable home and continuous parental care to H.C. Mother, on the other hand, after more than five years of receiving services and assistance, continues to put forth minimal efforts

and achieve minimal progress towards reuniting with H.C. Therefore, we discern no abuse of discretion or error of law on the part of the trial court in concluding that termination of Mother's parental rights to H.C. is in the best interest of the child.

Order affirmed.[8]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/17/2022

---

[8] In light of our disposition in this matter, Mother's third issue is moot.